UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JENNIFER A. POTVIN,

        Plaintiff,                    Case No. 05-CV-70291

                                         PAUL D. BORMAN

-vs-                              UNITED STATES DISTRICT JUDGE


THE CITY OF WESTLAND POLICE
DEPARTMENT, in its official capacity,
THE CITY OF WESTLAND, in its official
Capacity, CHIEF OF POLICE OF THE
WESTLAND POLICE DEPARTMENT,
in his official capacity, OFFICER KEN PERCIN,
in his official capacity and individually, OFFICER
PAUL WHITE, in his official capacity and
Individually, OFFICERS JOHN DOES 1-12 in
their official capacities and individually,

        Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

       Before this Court is Defendants' March 22, 2006 Motion for Summary Judgment.

(Docket No. 10). Plaintiff Jennifer A. Potvin ("Plaintiff") filed her Brief in Opposition to

Defendant's Motion on October 2, 2006. (Docket No. 28). Defendants filed their Reply Brief in

Support of their Motion for Summary Judgment on October 5, 2006. (Docket No. 29). The Court

held oral argument on Defendants' motion on October 26, 2006. For the following reasons, the

Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Summary Judgment.


**I.**       **BACKGROUND**

**A.    Plaintiff's Complaint**

Plaintiff filed her Complaint on January 27, 2005, asserting the following causes of

action against the above-captioned defendants.

I.      42 U.S.C. § 1983 (False Arrest, False Imprisonment, Malicious Prosecution
        Excessive Force)
II.     42 U.S.C. § 1983 (Municipal Liability)
III.    Liability under State Law
IV.     Intentional Infliction of Emotional Distress

At a motion hearing held on October 26, 2006, Plaintiff agreed to dismiss the following

defendants:

(1)     The City of Westland Police Department
(2)     The City of Westland
(3)     Chief of Police of the Westland Police Department

(Tr. p. 20). Plaintiff also identified two particular police officer defendants, Officers Bird and

Francisco, to replace the "John Does 1-12" in the Complaint. (Tr. p. 20-21). Finally, Plaintiff

agreed to dismiss the following Counts against all Defendants:

I.      False Arrest / Imprisonment
II.     Malicious Prosecution

(Tr. p. 30-34). Therefore, Plaintiff's remaining claims for the purposes of this summary

judgment motion are (1) § 1983 excessive force, (2) § 1983 deliberate indifference, (3) state law

assault & battery, and (4) state law intentional infliction of emotional distress.

**B.    Plaintiff's Factual Allegations**

This case involves two incidents between Plaintiff and Defendants in June 2004, both

occurring after the police were dispatched to Plaintiff's residence. On or about June 11, 2004,

Westland Police Officers responded to a call of a disturbance at a house in the City of Westland.

(Pl. Compl. ¶ 13). Arriving at the scene, the officers discovered Plaintiff's "friend" passed out

2

drunk on her front lawn. The officers then proceeded to try and bring her "friend" into reality and also proceeded to go up to the front door to find out from Plaintiff what was transpiring. The police officers asked Plaintiff to step outside; but she refused, explaining to the officers that her altercation with her friend was over. (Compl. ¶ 14). The police officers were dissatisfied with Plaintiff's answer, questioned the parties, and then handcuffed Plaintiff. (Compl. ¶ 15). Plaintiff alleges that while handcuffed, the officers began kicking and harassing Plaintiff's friend. When Plaintiff protested, the officers slammed Plaintiff's head into the hood of the squad car several times. (Compl. ¶ 16). As Plaintiff continued to protest verbally, an officer held a stun gun up to her face and threatened to pull the trigger. (Compl. ¶ 17). The officers then grabbed Plaintiff by the neck and banged her head against the metal frame of the squad car. (Compl. ¶ 18). At the police station, officers further made further physical and verbal assaults, and commented on Plaintiff's sexuality. (Compl. ¶ 19). At the station, officers slammed Plaintiff into a wall. (Compl. ¶ 20). Plaintiff informed the officers that she carried medicine for a heart condition. The officers refused to provide Plaintiff with her heart medication and then failed to return it to her the next morning when she was released. (Compl. ¶¶ 21-23).

On June 14, 2004, Westland police officers, along with EMS, responded yet again to a call at Plaintiff's residence for medical assistance. (Compl. ¶ 24). Plaintiff had suffered a cut lip while attempting to break up an altercation between a family member and a friend. (Compl. ¶ 25). By the time the EMS personnel arrived, Plaintiff had managed to treat the cut and informed EMS that its assistance was no longer needed and that she could also drive herself to the hospital. (Compl. ¶ 26). Plaintiff alleges that the police officers did not leave, but started to "menace" Plaintiff. (Compl. ¶ 27). Plaintiff attempted to leave the outdoor scene and return to her home; but the police officers tackled her, placed a knee in her back, and handcuffed her.

3

(Compl. ¶¶ 28-29). The police officers then proceeded to grab Plaintiff by the hair as she lay face down and slammed her face into the ground repeatedly, breaking her jaw. (Compl. ¶ 30). The officers refused to allow EMS on the scene to administer medical aid, as Plaintiff was choking on her own blood from the broken jaw. (Compl. ¶ 31). The officers placed Plaintiff in the squad car, grabbed her by her broken jaw, and forced her to take a breathalyzer. (Compl. ¶ 32). The officers brought her to the station, where they continued to refuse to provide Plaintiff medical attention. Upon learning that Plaintiff had a prior broken ankle, the officers began to step on her ankle repeatedly. (Compl. ¶ 33). Plaintiff continued to have blood in her mouth; yet the officers accused her of faking her injury, mocked her, and jokingly threatened her with a ticket for littering. (Compl. ¶¶ 34-35). Another officer placed a bag over Plaintiff's head for thirty (30) minutes which caused Plaintiff to feel panic and claustrophobia. (Compl. ¶ 36). After hours at the station and continued requests for medical attention, the Officers transported Plaintiff to the hospital. (Compl. ¶ 37). The doctor informed the officers that Plaintiff had suffered a broken jaw. The officers then removed her handcuffs, wrote her a ticket, and then left the hospital. (Compl. ¶ 38).

### C.    Defendants' Characterization of the Facts

#### 1.    June 12, 2004 Incident

On the night of June 12, 2004, the City of Westland received an Emergency 911 call from David Macken at 2629 Steiber. (Def. Br. S. J., p. 1). Macken reported that two female neighbors were engaged in a fist fight across the street. (Def. Br. S. J., p. 1). Officers Percin (Defendant) and Archambeau responded to the call. (Def. Br. S. J., p. 1). Upon arriving at the scene, the officers observed Jennifer Shoemake, Plaintiff's friend, lying on the grass wrapped in a blanket. (Def. Br. S. J., p. 1). The officers approached Shoemake and attempted to wake her up.

4

Shoemake was intoxicated, uncooperative, and used obscenities towards the officers. (Def. Br. S. J., p. 1-2). The officers instructed Shoemake to discontinue using obscenities, but she did not and refused to answer the questions of Officers Percin. (Def. Br. S. J., p. 2). Meanwhile, Officer Archambeau knocked on the front door of Plaintiff's residence to see if anyone knew Shoemake. (Def. Br. S. J., p. 2). Shoemake continued to be disruptive, used obscenities, and instructed Officer Percin to go ahead and arrest her. (Def. Br. S. J., p. 2). At this time, Officers Bird (Defendant) and Darga arrived at the scene. (Def. Br. S. J., p. 2).

After speaking with Plaintiff, Officer Archambeau instructed Plaintiff to stay in her residence. Plaintiff failed to obey this order and came out yelling, "F***ing leave my baby alone." (Def. Br. S. J., p. 2). The officers noticed that Plaintiff was intoxicated and interfered with Officer Percin's investigation of Shoemake. (Def. Br. S. J., p. 2). Plaintiff continued yelling obscenities and refused to go inside her home. (Def. Br. S. J., p. 2). After several verbal warnings to return to the residence and stop yelling obscenities, Officer Percin informed Plaintiff that she was under arrest for Disorderly Person. (Def. Br. S. J., p. 2). As Officer Percin began to place the handcuffs on Plaintiff, she began to pull away and began kicking at the officers. (Def. Br. S. J., p. 2). The officers then put her on the ground with a straight arm bar and informed her to stop resisting, but she kept thrashing on the ground. (Def. Br. S. J., p. 2). The officers continued to give Plaintiff verbal warnings, but she continued to fight. (Def. Br. S. J., p. 2). In order to place Plaintiff in the patrol car, Officer Bird pressed Plaintiff against the patrol car. (Def. Br. S. J., p. 2). Since Plaintiff continued to yell and kick, an officer removed the cartridge from his taser and showed her the arc to gain her compliance. (Def. Br. S. J., p. 2). Plaintiff then stopped resisting. (Def. Br. S. J., p. 2).

Both Plaintiff and Shoemake were charged with Disorderly Person-Intoxicated and

Resisting Arrest.  (Def. Br. S. J., p. 3). Neither complained of any injuries at that time nor sought

any medical treatment.  (Def. Br. S. J., p. 3).

> 2.     June 14, 2004 Incident

On June 14, 2004, a 911 Operator received a call from Plaintiff's residence at 11:33 p.m.

(Def. Br. S. J., p. 3). The Westland Fire Department was then dispatched to the location.  (Def.

Br. S. J., p. 3). The EMS Incident report noted that they found that Plaintiff had injuries to her

lip, was highly intoxicated, and refused to be treated.  (Def. Br. S. J., p. 3). Officers White,

Francisco, Bird (Defendants), and Darga arrived on the scene at 11:40 p.m. and noticed that

Plaintiff had a bloody lip and was intoxicated.  (Def. Br. S. J., p. 3). Officer White informed

Plaintiff that the officers were there to investigate an assault complaint.  (Def. Br. S. J., p. 3).

Plaintiff began to yell obscenities at the officers and then walked into the street.  (Def. Br. S. J.,

p. 3). After repeated attempts to quiet Plaintiff and her repeated refusals to do so, the officers

attempted to arrest her.  (Def. Br. S. J., p. 3-4). Plaintiff attempted to run but tripped over the

curb. (Def. Br. S. J., p. 4). The officers had to force Plaintiff's arms behind her back to handcuff

her.  (Def. Br. S. J., p. 4).

Defendants additionally offer the testimony of Jason Carriere, an eyewitness to the events

surrounding Plaintiff's arrest on June 14, 2004.[1] Carriere arrived by car at Plaintiff's house to pick up a

friend of Plaintiff's "Julie" for a date around 10:15 or 10:30 p.m. that night. (Dep. Carriere, p. 5).

Carriere arrived at the house at the same time as the EMS personnel and observed the scene from

his car parked near the EMS vehicle. (Dep. Carriere, p. 7). Carriere further testified that Plaintiff

refused to allow the medics to help her. (Dep. Carriere, p. 7-8). The EMS personnel continued to

---

[1] Portions of the deposition of Jason Carriere can be found in Defendant's Reply Brief in
Support of their Motion for Summary Judgment. (Docket No. 29)

chase her around, but Plaintiff refused their help and used profanity. (Dep. Carriere, p. 8-9). Carriere remembered Plaintiff being "absolutely loaded." (Dep. Carriere, p. 11). Carriere stated that two police officers arrived on the scene and tried to subdue Plaintiff and calm her down. (Dep. Carriere, p. 11). During the incident, Plaintiff bumped into Carriere's car "because she was staggering." (Dep. Carriere, p. 11). He testified further that the officers had to restrain Plaintiff physically. (Dep. Carriere, p. 13). He saw the officers grab Plaintiff's arms and put her to the ground. (Dep. Carriere, p. 13). Carriere also testified that he did not observe the officers grab her head or slam it into the ground. (Dep. Carriere, p.14). He estimated that it took the officers one and a half to two minutes to place her in the squad car, and Plaintiff continued to spit and to use profanity towards the officers. (Dep. Carriere, p. 15).

On the way to the station, Plaintiff told the officers that her girlfriend had given her a hard uppercut to the face and that Plaintiff thought that her jaw was broken. (Def. Br. S. J., p. 4). The officers arrived at the police station at 12:00 a.m. and administered a portable breathalyzer test. (Def. Br. S. J., p. 4). The officers then requested that the Westland Fire Department transport Plaintiff to the hospital for treatment. (Def. Br. S. J., p. 4). The Westland Fire Department arrived at 12:03 a.m. (Def. Br. S. J., p. 4). By 12:18 a.m. the EMS unit was en route and by 12:26 a.m. Plaintiff was at the hospital. (Def. Br. S. J., p. 4). During the trip to the hospital, Plaintiff told EMS technicians that she had been drinking heavily and that she had sustained bruises to her arms and legs after wrestling with the police officers. (Def. Br. S. J., p. 4).

3.      State Court Criminal Proceedings

Plaintiff was charged with four misdemeanors arising out of the incidents of June 12 & 14, 2004. (Def. Br. S. J., p. 4). Plaintiff entered into a plea agreement whereby in exchange for

dismissals of the two counts arising from the night of June 12, 2004, she pleaded guilty to the two misdemeanor charges − Disorderly Person-Intoxicated and Resisting Arrest − on the night of June 14, 2004.  (Def. Br. S. J., p. 4-5). Plaintiff submits an Affidavit from 18th District Court that due to some clerical or mechanical failure, the transcript of those proceedings has not been preserved. (Pl. Br. Ex. 4, Affidavit of 18th District Court).

## II.    ANALYSIS

### A.    Summary Judgment Standard

Pursuant to Federal Rule of Civil Procedure 56, a party against whom a claim, counterclaim, or cross-claim is asserted may "at any time, move with or without supporting affidavits, for a summary judgment in the party's favor as to all or any part thereof." FED. R. CIV. P. 56(b).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

*Id*. at 323; *Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987).

A fact is "material" for purposes of a motion for summary judgment where proof of that fact "would have [the] effect of establishing or refuting one of the essential elements of a cause of action or defense asserted by the parties." *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984) (quoting BLACK'S LAW DICTIONARY 881 (6th ed. 1979)) (citations omitted).  A dispute

8

over a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Conversely, where a reasonable jury could not find for the nonmoving party, there is no genuine issue of material fact for trial. *Id.*; *Feliciano v. City of Cleveland*, 988 F.2d 649, 654 (6th Cir. 1993). In making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party. *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

If this burden is met by the moving party, the non-moving party's failure to make a showing that is "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial" will mandate the entry of summary judgment. *Celotex*, 477 U.S. at 322-23. The non-moving party may not rest upon the mere allegations or denials of his pleadings, but the response, by affidavits or as otherwise provided in Rule 56, must set forth specific facts which demonstrate that there is a genuine issue for trial. FED. R. CIV. P. 56(e). The rule requires that non-moving party to introduce "evidence of evidentiary quality" demonstrating the existence of a material fact. *Bailey v. Floyd County Bd. of Educ.*, 106 F.3d 135, 145 (6th Cir. 1997); *see Anderson*, 477 U.S. at 252 (holding that the non-moving party must produce more than a scintilla of evidence to survive summary judgment).

**B.      42 U.S.C. § 1983 Excessive Force Claim**

Defendants argue that Plaintiff's assault & battery and excessive force claims are barred by the Supreme Court's decision in *Heck v. Humphreys*. 512 U.S. 477 (1994). Defendants argue that by pleading guilty in state court to (1) Disorderly Person-Intoxicated and (2) Resisting Arrest, her guilty plea to Resisting Arrest would preclude any assault & battery or excessive force claim under § 1983 because as a matter of law those claims would impugn the validity of

9

her state court conviction under *Heck*. Defendants cite *Cummings v. City of Akron*, 418 F.3d 676 (6th Cir. 2005), and *Schreiber v. Moe*, – F. Supp. 2d –, 2006 WL 2331175 (W.D. Mich. 2006), for the proposition that Plaintiff's excessive force claims should be barred by the *Heck* doctrine.

Plaintiff cites several cases from the Ninth Circuit and the California state court in response for the proposition that by allowing her § 1983 excessive force claims, the Court would not necessarily impugn the validity of the state court proceedings in this instance. Plaintiff relies on the fact that since, due to clerical or administrative error, there is no record of the state court plea proceedings, it is impossible for this Court to determine which discrete acts formed the factual basis for her guilty pleas. Hence, according to Plaintiff, the Court could find that the officers used excessive force without impugning of her state court conviction.

The Court in *Heck* held:

> [I]n order to recover for damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed by direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such a determination, or called into question by a federal court's issuance of a writ of habeas corpus.

512 U.S. at 486-87 (footnote omitted). The Court further stated that a "district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence." *Id*. at 487. However, the Court finds that the *Heck* exception in this instance does not support dismissal of Plaintiff's excessive force claims.

Defendant cites *Cummings* and *Schreiber* for the proposition that the *Heck* doctrine bars all of Plaintiff's alleged excessive force claims. Neither case, nor other Sixth Circuit law, hold that the *Heck* doctrine bars excessive force claims arising after the facts that gave rise to the plaintiff's conviction of resisting arrest.

10

In *Cummings*, two police officers arrived at a house to investigate a call of domestic disturbance. 418 F.3d at 679. The alleged victim informed the officers that the perpetrator was in a neighboring house. *Id*. The officers approached the neighboring house and knocked on the door. *Id*. The plaintiff opened the door, and the officers detected marijuana odor emanating from inside of the residence. When the plaintiff attempted to close the door, the officers then entered the home. *Id*. The officers struggled with the plaintiff, and the plaintiff resisted. *Id*. During the arrest attempt, the officers struck the plaintiff with fists and their batons in an effort to subdue him. *Id*. at 680. A third officer arrived on the scene and used a taser gun on the plaintiff. *Id*. The plaintiff was finally subdued, handcuffed, and taken to the station. *Id*. The plaintiff ultimately pleaded nolo contendere to a state court charge of misdemeanor assault on an officer, served a thirty day sentence, and was released. *Id*.

The plaintiff then brought a § 1983 suit against the police officers for excessive force. The Sixth Circuit dismissed the plaintiff's federal claim because it would have impugned his state court conviction under *Heck*. Specifically, the court stated that the "struggle between [the plaintiff] and the officers gave rise to both [the plaintiff's] assault conviction and the excessive force claim, and the two are inextricably intertwined." 418 F.3d at 682-83. Furthermore since claiming excessive force would have been a viable defense to his state court charge of assault of a police officer, the plaintiff could not maintain the excessive force action without disturbing his underlying state conviction. *Id*. at 683-84.

In *Schreiber*, a police officer responded to a 911 call involving a domestic dispute between a father and his fifteen year-old daughter. 2006 WL 2331175, at *1. The officer arrived on the scene, and the plaintiff became abusive to the officer. Since the officer did not allow the plaintiff to leave the room, the plaintiff went onto a second floor patio to relieve himself. *Id*. at

11

*3. The officer then locked the patio door so that the plaintiff could not reenter the apartment. Id. The plaintiff became enraged and shattered the glass patio door window. Id. at *4. During the ensuing struggle, the officer punched the plaintiff several times during the two-minute attempt to subdue and to handcuff the plaintiff. Id. The plaintiff alleged that once back at the squad car the police officer kicked him five times in the ribs. Id. The plaintiff ultimately plead no contest to the misdemeanor offense of attempting to assault, wound, resist, obstruct, oppose, or endanger the life of a police officer in violation of Michigan law. Id.

The court held that the *Heck* doctrine only barred the plaintiff's claim in part. Id. at *13. Although the *Heck* doctrine did bar the claims arising from the actual struggle to arrest the plaintiff, the allegations of being kicked in the ribs by the police officer was "separate and distinct from the altercation that gave rise to [the plaintiff's] conviction and the principal aspects of the excessive force claim." Id. In regards to the alleged rib kicking, the court found that those allegations did not imply that the plaintiff's state court conviction was invalid. Id.

      1.     June 12, 2004 Incident

On June 12, 2004, Plaintiff testified that she had been drinking at clubs earlier that night with her girlfriends, but did not drink after she arrived at her residence. (Dep. Potvin, p. 164-65, 168-69).[2] She testified that one of her girlfriends slammed her hand in the car door at about 2:30 or 3:00 a.m., which caused Plaintiff to cry out loudly. (Dep. Potvin, p. 166-67). A police officer then approached her front door, inquired about the situation, and then asked her about Shoemake who was laying in the grass on the other side of Plaintiff's sister's car. (Dep. Potvin, p.169-70). Plaintiff then testified that two to four officers began to kick Shoemake while she was on the

---

[2] Excerpts from the deposition of Jennifer Potvin can be found as Exhibit 1 in Plaintiff's Response to Defendants' Motion for Summary Judgment. (Docket No. 21).

ground. (Dep. Potvin, p. 171-72). Plaintiff admitted that the officers ordered her to stay where she was, but Plaintiff followed the officers out to Shoemake because "they had no reason to tell me to stay on my porch." (Dep. Potvin, p. 173-74).

Plaintiff then approached the officers who were kicking Shoemake and told them that if they wanted to take someone to jail, they should take the Plaintiff. (Dep. Potvin, p. 174). The officers then handcuffed Plaintiff. (Dep. Potvin, p. 174). According to Plaintiff's testimony, the officers continued to kick Shoemake and began hitting her on the head with a flashlight. (Dep. Potvin, p. 175). Plaintiff admitted that in response to seeing her girlfriend accosted by the officers, she began to protest verbally and to use profanity. (Dep. Potvin, p. 176-77, 181). Officer Bird pushed her into the squad car and began to slam her head against the hood of the squad car "five to ten times" chin first by the nape of the neck. (Dep. Potvin, p. 176-77). In response to a comment made by Plaintiff to an officer, an officer pulled out a taser and threatened to use it if she did not "shut up." (Dep. Potvin, p. 177-78). The officer did not use the weapon. Plaintiff then informed the officer that she had a heart condition; and upon hearing that, the officer put away the taser. (Dep. Potvin, p. 178). Plaintiff further admitted that she was being "verbally abusive" towards the officers because they were attacking her girlfriend and making comments about Plaintiff's sexuality. (Dep. Potvin, p. 179-80).

When placed in the squad car, the officers then slammed Plaintiff's head into the door frame. (Dep. Potvin, p. 182). At the police station, the officer pushed Plaintiff into walls a number of times. (Dep. Potvin, p. 185-86).Defendants introduce Plaintiff's statements in the Westland Police Incident Report that when the police officers instructed Plaintiff to return to her home, she stated to the officers "F***ing leave my baby alone, she didn't do anything, arrest me." When the officers again instructed Plaintiff to return to her house she stated "F*** you

13

mother f***er, I don't have too [sic], I pay my taxes, arrest me instead." (Def. Br. S.J. Ex. 2).

Further, Defendants point out that at no time did Plaintiff seek any medical treatment for the

alleged excessive force on June 12, 2004.

Officer Bird testified at his deposition that when he attempted to arrest Plaintiff:

Q:    Did you have any trouble getting her to your patrol car?
A:    Yes
Q:    Tell me about that.
A:    As I tried to escort her back to the patrol car, she was constantly trying to pull
      away from my grasp, trying to get over to where her girl friend was; constantly,
      you know, yelling and screaming still, kicking at me to try to get away from my
      grasp. I continued and as I escorted her back to the car, eventually I pushed her up
      where you consider the A-post of a car –
Q:    The A-Pillar. Right.
. . . .
Q:    Why did you do that as opposed to putting her inside the car?
A:    Because her behavior was constant and even getting more aggressive. She
      continued to kick even more, She was –
Q:    She was being loud?
A:    Well, the being loud isn't the issue. The part of kicking me and the pulling away
      from me and just generally not allowing me to put her in the car, she's pushing
      against me. As I'm pushing her towards the back of the car, she's pushing the
      other way trying to get towards her girlfriend. So at this point I pushed her up
      against the car to, number one, keep her where she is so that I don't have to worry
      about her trying to run over toward the other officers who are dealing with the
      situation, and, number tow, to try to get her to calm down.
. . . .
Q:    What was she doing when you pushed her up against the car?
A:    She was still kicking at me, still trying to push against the car with her body
      weight trying to push back against me.
Q:    But she couldn't really kick you, right, because she's up against the car?
A:    Oh, she could kick.
Q:    Kick back?
A:    She's kicking me in the shins, she's trying to kick me between the legs.

(Dep. Bird, p. 17-19).[3]

        2.      June 14, 2004 Incident

_____

        [3] Excerpts from the deposition of Officer Stephen Bird can be found as Exhibit 7 in
Defendants' Reply Brief in Support of Their Motion for Summary Judgment. (Docket No. 29).

On June 14, 2004, Plaintiff testified that she and Shoemake had been drinking at the union hall and the Ballroom Bar earlier in the night. (Dep. Potvin, p. 86, 93-94). Plaintiff and Shoemake arrived at home and were there with Marie and her friend Jennifer. (Dep. Potvin, p. 86). At some point, Marie and Shoemake were playing around and then started wrestling (Dep. Potvin, p. 88). Plaintiff attempted to break up the fight when Shoemake inadvertently either punched or elbowed Plaintiff in the face, splitting Plaintiff's lip. (Dep. Potvin, p. 89). Plaintiff had her sister call the EMS. (Dep. Potvin, p. 89).

Plaintiff testified that the EMS arrived first and then at least one police officer arrived at the scene and asked her what was going on. (Dep. Potvin, p. 96-97). Plaintiff further stated that she began to back away from the officer towards the EMS personnel because of her fear of attack from June 12, 2004. (Dep. Potvin, p. 98). As Plaintiff approached the EMS vehicle, Officer Francisco allegedly tackled her, threw her to the ground, and then began smashing her head against a tree stump. (Dep. Potvin, p. 99). Plaintiff further testified that she felt her jaw break as Officer Francisco was slamming her head into the stump. (Dep. Potvin, p. 105-06). At some point, Officer Francisco handcuffed Plaintiff while still on the ground. (Dep. Potvin, p. 99). When an officer placed Plaintiff in the squad car, she claims that the officers grabbed her broken jaw and forced her to take a breathalyzer. (Dep. Potvin, p. 113).

Again, Defendants describe a much different version of events. First, Defendants offer the testimony of Jason Carriere who testified that Plaintiff was plainly intoxicated when he arrived at the scene and refused the help of the EMS personnel. Carriere also observed the police officers on the scene wrestle Plaintiff to the ground and handcuff her. Carriere stated that he did not observe the officers slam Plaintiff's head into the ground or use any other excessive force. Defendants also introduce Plaintiffs' statements in the police incident report of Officers White

15

and Francisco on June 14, 2004. After being arrested, Plaintiff complained that "her girlfriend hit her punched her hard with an uppercut. She thought her jaw was broke." (Def. Br. S.J. Ex. 4) On the Wayne County EMS Run Report, the form states that Plaintiff stated that "she was punched in the jaw by her girlfriend" and admitted "to drinking heavily [that] evening." (Def. Br. S.J. Ex. 4). Defendants also point out that Plaintiff's hospital records do not attribute a cause of the broken jaw. (Pl. Br. Opp. Ex. 2). Finally, Defendants introduced evidence that the officers administered the breathalyzer test at the police station, and not in the police car as Plaintiff claims.

### 3.  Application of the *Heck* Doctrine

Plaintiff argue that since there is no record of the factual basis for Plaintiff's guilty pleas in the state court, this Court cannot determine which of her discrete acts constituted her charge of Resisting Arrest, so also cannot determine whether the claims of excessive force occurred before or after her acts of resistance to the attempts of arrest. Although Plaintiff pleaded guilty to a resisting arrest charge and admitted at oral argument that the officers had probable cause to arrest her, *Heck* does not bar any excessive force that occurred after Plaintiff had been arrested. Although it is unfortunate that the transcript of her guilty pleas in state court has been lost, it is impossible for this Court at this stage to determine what particular acts formed the basis for her plea.[4] Finally, Defendants did not attach any deposition testimony from the Defendant police officers to rebut Plaintiff's version of events.

Viewing the evidence in the light most favorable to Plaintiff, the Court finds that the

---

[4] It is also unclear if Plaintiff was charged with Resisting Arrest under the Westland Code of Ordinances or under Michigan state law. *See* WESTLAND, MI CODE § 62-36(a) (2005); MICH. COMPL. LAWS ANN. § 750.479.

*Heck* doctrine does not bar Plaintiff's claims arising out of June 12 and 14, 2004, as a matter of law. Plaintiff's testimony creates a genuine issue of material fact as to at what point Plaintiff was arrested by Defendant police officers and whether Defendants used any excessive force after the arrest was effectuated.

Defendants further argue that the police officers in this instance are entitled to qualified immunity on Plaintiff's excessive force claims. The Supreme Court has held that "[q]ualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted." *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004). To determine whether an officer is entitled to qualified immunity, the court must inquire whether the facts as alleged establish that the officers (1) violated a constitutional right and (2) whether that right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201-02 (2001). Additionally, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. The plaintiff has the burden of establishing both prongs to overcome qualified immunity. *Barrett v. Steubenville City Schs.*, 388 F.3d 967, 970 (6th Cir. 2004).

Excessive force claims are evaluated under the reasonableness standard of the Fourth Amendment. *Sigley v. City of Parma Heights*, 437 F.3d 527, 533 (6th Cir. 2006). The reasonableness of the amount of force used turns on the facts and circumstances of each case. *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004). The Court must evaluate the following factors to determine whether a police officer's actions are reasonable: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Graham v. Connor*, 490 U.S. 386, 396 (1989).

17

The "reasonableness" of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. . . .Not every push or shove, even if it may later seem unnecessary in the peace of the judge's chamber, violates the Fourth Amendment. The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation.

*Id.* at 396-97.

However, the Court finds that Defendants have not carried their burden to show that there is no genuine issue of material fact whether the police officers used excessive force on Plaintiff after her valid arrest on June 12 and 14, 2004. *See Shreve v. Jessamine County Fiscal Court*, 453 F.3d 681, 687-88 (6th Cir. 2006) (holding that the plaintiff's allegations that the officers continued to use force after she was on the ground and "out of it" due to pepper spray created a genuine issue of material fact to an excessive force claim).

### C.   Illegal Entry and Search of Plaintiff's Home

Plaintiff testified that on the night of June 12, 2004, the police officers on the scene illegally entered her house. (Dep. Potvin, p. 212). She claims that the officers never presented her with a search warrant and did not tell her why they were searching her house. (Dep. Potvin, p. 182, 212). Furthermore, after Plaintiff's release from custody, Plaintiff indicated that her sister informed her that she noticed "footprints and dirt on her pillows and pillow cases from where they were standing on her bed. . . ." (Dep. Potvin, p. 212-13). Plaintiff does not claim that this search caused any damage to her house or that the police officers illegally seized any items or evidence from the house.

Defendants do not offer any rebuttal testimony on this claim. Defendants appear to argue that the *Heck* doctrine would bar the claims of illegal entry or search.

As discussed, *supra*, *Heck* doctrine only bars a § 1983 suit insofar as it would impugn the

18

validity of a state court conviction. Here, finding that the police officers performed an illegal search of her house is completely collateral to Plaintiff's convictions for Disorderly Person-Intoxicated and Resisting Arrest arising from the events of June 14, 2004. However, Plaintiff has alleged no damages from the unlawful entry. Therefore, to the extent that Plaintiff is making a Fourth Amendment claim, the Court dismisses it.

### D.    Deliberate Indifference Claims

Plaintiff claims that Defendant police officers (1) discarded her medications while imprisoned overnight on June 12, 2004 and removed all of the bedding and blankets from her cell and turned up the cold air overnight on June 12, 2004 and (2) failed to provide proper medical treatment to her broken jaw on June 14, 2004. Although Plaintiff does not specify the nature of the legal claim, the Court interprets these allegations as a "deliberate indifference" claim under § 1983. Although the Eighth Amendment does not apply to pretrial detainees, they are nonetheless shielded from cruel and unusual punishments by the Due Process Clause of the Fourteenth Amendment, which provides similar if not greater protection than the Eighth Amendment. *Spencer v. Bouchard*, 449 F.3d 721, 727 (6th Cir. 2006). The Sixth Circuit applies the Eighth Amendment standard to pretrial detainees "for the sake of simplicity." *Id*.

A prisoner may bring a § 1983 claim regarding the conditions of her confinement only when she can show "deliberate indifference" to her "serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To establish a "deliberate indifference" claim, an inmate must show that the alleged mistreatment was "objectively" serious and that defendants "subjectively" ignored the inmate's medical or safety needs. *Farmer v. Brennan*, 511 U.S. 825, 829 (1994). A plaintiff may establish the subjective prong of the inquiry by establishing that "the official knows of and disregards an excessive risk to inmate health or safety," which is to say "the official must be both

19

aware of facts from which the inference could be drawn that a substantial risk of harm exists, and he must also draw that inference." *Id*. at 837.

> 1.      June 12, 2004

Plaintiff testified that when brought to the police station she informed the officers that she needed to take her heart medication every four hours. (Dep. Potvin, p. 186). Plaintiff admitted that her Xanax and Tropol pills were neither labeled on the pills themselves, nor housed in a marked container. She did state to the officers that she had the "scrips" for them carried loosely in the pill case. (Dep. Potvin, p. 186-87). Plaintiff further stated that the next morning when she asked about her medication, the prison officials tried to find it but eventually told her that the pills had been either lost or destroyed. (Dep. Potvin, p. 189). The Plaintiff testified the following happened the next morning:

> Q:      What time were you released?
>
> A:      Well, that next morning they came and got me and took me to the community cell where Jenny was where the lady took my cuffs and stuff off I asked her for my medicine. She said hang on a minute. She said there was no medication in my property bag, no pills were in there, no nothing, that they probably had destroyed it. As you know, I told her – I explained to her my situation, that I needed that medicine and I couldn't afford to be locked in a jail cell and have my heart go into 160 beats per minute. So she was pretty cool about everything. She called around maybe to see if it got misplaced or whatnot. They couldn't find it. I was supposed to be held until Monday and surprisingly within like a half hour, 45 minutes they came back and said they would release me on a $500 bond, which I believe had to be due to the fact that they misplaced my medicine or destroyed it, like you said, thinking it could have been anything.

(Dep. Potvin, p. 188-89).

Viewing the evidence in the light most favorable to Plaintiff, there is evidence that (1) the police officers did in fact destroy or discard her medication or (2) knew of her medical condition and disregarded it, thus satisfying the "subjective" prong of the deliberate indifference analysis.

*See Farmer*, 511 U.S. at 837. It is also significant that Defendants have offered no rebuttal evidence to Plaintiff's testimony. Plaintiff next testified that the officers placed her in a cell and then removed all of the bedding, mattress, pillow, and toilet paper and turned on the air conditioning to make it frigid. (Dep. Potvin, p. 191-92, 219-20). Plaintiff remained in that cell for "probably maybe five, six hours" before being transported to a community cell that contained beds, blankets, and covers. (Dep. Potvin, p. 220).

The Sixth Circuit has recognized that the Eighth Amendment may be violated when a prison fails to provide adequate shelter, clothing, bedding, or environmental conditions within a cell. *Spencer*, 449 F.3d at 728 (holding that a prisoner stated a deliberate indifference claim where a prisoner's cell exposed him to outside cold temperatures for months and where prison officials did not provide adequate clothing); *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (holding that low cell temperatures combined with a failure to issue blankets may establish an establish a Eighth Amendment violation). However, a court must look to the "circumstances, nature, and duration of the deprivation [to] determine whether a violation has occurred." *Spencer*, 449 F.3d at 728 (internal quotation omitted).

In this instance, Plaintiff claims that the prison officials removed her bedding, blankets, and turned up the cold air for a period of five to six hours the night of her arrest on June 12, 2004. Defendants have offered no rebuttal evidence. Viewing the evidence in the light most favorable to Plaintiff, the Court denies summary judgment on this claim.

2.     June 14, 2004

Plaintiff testified that she informed the arresting officers that she had a broken jaw and was bleeding from the mouth on the night of June 14, 2004. She testified that while at the station, she was bleeding profusely and spitting blood all over the police station. (Dep. Potvin, p. 115-

17). Plaintiff stated that in response to her bleeding, the officers put a "brown paper bag" over her head and then a nylon bag. (Dep. Potvin, p. 118-19). One of the officers began to write a mock ticket for littering after Plaintiff had spit up blood in the station. (Dep. Potvin, p. 118). She further testified that it took about a "half an hour to an hour" once she arrived at the station before officers transported her to the hospital. (Dep. Potvin, p. 115).

Defendants argue that according to Westland Police and EMS reports, Plaintiff arrived at the police station at 12:00 a.m. Plaintiff then took a portable breathalyzer. The police officers then requested that the Westland Fire Department transport Plaintiff to the hospital for treatment at 12:02 a.m. The EMS unit arrived at 12:03 a.m. The EMS unit arrived at 12:03 a.m. At 12:18 a.m. the Plaintiff was en route to the hospital and arrived at 12:26 a.m. (Def. Br. S.J. Ex. 5, EMS Run Report).

Plaintiff's deliberate indifference claim on this issue fails. Plaintiff admits that she requested and received effective medical assistance. The EMS logs show that Plaintiff was at the hospital under thirty (30) minutes from arriving at the police station, which is consistent with Plaintiff's testimony. Plaintiff has offered no reason why the police officers' response to her injury was not "objectively" unreasonable. Therefore, the Court finds that Plaintiff cannot maintain a deliberate indifference claim on this issue as a matter of law. *See Lewis v. McClennan*, 7 Fed. Appx. 373, 375 (6th Cir. 2001) (unpublished).

### E.    State Law Claims

#### 1.    Assault & Battery

Under Michigan law, a police officer who uses excessive force during a valid arrest may still be held liable for assault and battery. *White v. City of Vassar*, 157 Mich. App. 282, 293 (1987). To the extent that Plaintiff creates a genuine issue of material fact as to the police

22

officers' use of excessive force after her valid arrest, Plaintiff can maintain her state law assault & battery claim against the individual officers.

To the extent that Plaintiff pleads in the alternative that the police officers were grossly negligent, Michigan law disfavors attempts to convert claims involving elements of intentional torts into claims of gross negligence. *VanVorous v. Burmeister*, 262 Mich. App. 467, 483-84 (2004); *Sudul v. City of Hamtramck*, 221 Mich. App. 455, 458 (1997). In this instance, Plaintiff's claim of gross negligence is premised on her intentional tort claim. Therefore Michigan law clearly holds that the Court dismiss the gross negligence claims arising out of the incidents on June 12 and 14, 2004.[5]

### 2.    Intentional Infliction of Emotional Distress

In order to state a claim for intentional infliction of emotional distress under Michigan law, a plaintiff must put forth sufficient evidence of (1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress. *Johnson v. Wayne County*, 213 Mich. App. 143, 161 (1995). There can only be liability for the tort of IIED if the conduct in question "has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in civilized community." *Id.*

However, Michigan law recognizes that a valid arrest with probable cause cannot give rise to a claim of intentional infliction of emotional distress. *Cebulski v. City of Belleville*, 156

---

[5] At least one other federal court in the Eastern District of Michigan has read Michigan state law to hold that a plaintiff can plead assault & battery and gross negligence in the alternative. *See Dubay v. Craze*, 327 F. Supp. 2d. 779, 784 (E.D. Mich. 2004). This Court does not read Michigan case law to support that proposition. *See Grable v. Brown*, No. 256215, 2005 WL 3481430, *2 (Mich. Ct. App. Dec. 20, 2005) (unpublished).

Mich. App. 190, 196 (1987). To the extent that the police officers used excessive force after Plaintiff's valid arrest on the night of June 12 and 14, 2004, as discussed *supra*, Plaintiff has alleged sufficient facts for an IIED claim.

## III.    CONCLUSION

The Court **DENIES** Defendant's Motion for Summary Judgment on the following claims:

    (1)    § 1983 Excessive Force
    (2)    § 1983 Deliberate Indifference Claim on June 12, 2004
    (3)    State Law Assault & Battery
    (4)    State Law Intentional Infliction of Emotional Distress

The Court **GRANTS** Defendant's Motion for Summary Judgment on the § 1983 Deliberate Indifference Claim on June 14, 2004.

The following Defendants have been dismissed:

    (1)    City of Westland Police Department
    (2)    City of Westland
    (3)    Chief of Police of the Westland Police Department

The following Defendants remain:

    (1)    Officer Ken Percin
    (2)    Officer Paul White
    (3)    Officer James Francisco
    (4)    Officer Stephen Bird

**SO ORDERED.**

                        s/Paul D. Borman
                        PAUL D. BORMAN
                        UNITED STATES DISTRICT JUDGE

Dated:  November 7, 2006

CERTIFICATE OF SERVICE

24

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on November 7, 2006.

s/Denise Goodine
Case Manager